UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JOHN NOKES, | Case No. 1:17-cv-482 |
|     Plaintiff, | Judge Michael R. Barrett |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (DOC. 14)** |
| MIAMI UNIVERSITY, et al., | |
|     Defendants. | |
| _____/ | |

      Plaintiff – known as John Nokes for purposes of this lawsuit – filed a Complaint for declaratory judgment, violation of 42 U.S.C. §1983, violation of Title IX, and injunctive relief against Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme. (Doc. 1). Plaintiff alleges that, after a procedurally defective disciplinary hearing, a hearing panel acting on behalf of Defendant Miami University found him responsible for sexual misconduct and informed Plaintiff that he was suspended from Defendant Miami University from April 6, 2017 through May 15, 2019. (Doc. 1; PAGEID# 28). On July 16, 2017, this Court granted Plaintiff's Motion for Leave to Proceed Anonymously. (Doc. 3).

      This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 14), in which Plaintiff seeks an order enjoining Defendants from releasing his name in response to a public records request until this Court has had an opportunity to rule on the pending Motion for Preliminary Injunction (Doc. 2). The preliminary injunction hearing will take place on August 10, 2017, and will determine whether this Court should preliminarily enjoin

1

Defendant Miami University from imposing disciplinary sanctions against Plaintiff, in order to preserve *the status quo*, until this Court is able to determine the merits of his claims.[1]

## I. BACKGROUND

### a. Plaintiff's Complaint (Doc. 1)

Defendant Miami University has found Plaintiff responsible for sexual misconduct, suspending him from April 6, 2017 through May 15, 2019. (Doc. 1; PAGEID# 28). Specifically, Miami's Hearing Panel found that Plaintiff "engaged in sexual conduct with [Jane Roe] on two occasions . . . without her knowingly being able to consent." (*Id*. at 27). However, Plaintiff argues that his hearing was defective for two reasons:

First, Plaintiff argues that he was afforded inadequate notice of the nature of the allegations against him. He reasons that the University's April 5, 2017 Notice of Violation alleged that Plaintiff committed sexual assault by the use of force or threat of force, in violation of Section 103A (Sexual Assault). (*Id*. at 31) Specifically, the Notice of Violation stated as follows:

> "The Office of Ethics and Student Conflict Resolution is in receipt of a report from [Jane Roe]. Specifically, on November 17, 2016, you allegedly penetrated [Jane Roe] with your fingers and performed unwanted oral sex on her in an alleyway by Bishop Hall. You allegedly continued even when she showed resistance. Furthermore, [Jane Roe] reported that she had to use the restroom, and as she entered the restroom in Bishop Hall, you allegedly entered with her, holding her head down to perform oral sex on you.
>
> This incident is an alleged violation of the Student Conduct Regulation- **Section(s) 103A (Sexual Assault)- 2 Counts.**"

---

[1] Presumably, Plaintiff also intends to seek at the hearing a longer order preliminarily enjoining Defendants from releasing his name until the Court makes a final merits determination.

(Doc. 17-1; PAGEID# 544) (emphasis in original).[2]  Plaintiff argues that the Notice of Violation amounts to "no notice at all," reasoning that the April 28, 2017 hearing focused on Jane Roe's alcohol consumption and alleged inability to consent—not use of force as alleged in the Notice of Violation.  (Doc. 2; PAGEID # 122, 129).

Second, Plaintiff argues that he was never provided the opportunity to cross-examine three witnesses who supplied written testimony to the hearing panel.  To further support that his inability to cross-examine the witnesses amounted to a Constitutional violation, Plaintiff alleges that a member of the hearing panel "made a stunning admission." (*Id*. at 127).  She said: "when [Jane Roe] had three witness statements, it truly disadvantages everyone if you can't ask questions.  So if we can't ask questions, I have to take this as fact.  That all is true." (Doc. 1; PAGEID# 24).

In addition to compensatory damages and declaratory relief, Plaintiff seeks a permanent injunction "restoring John [Nokes] as a student and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties." *(Id*. at 36).

### b. Plaintiff's Motion for Preliminary Injunction (Doc. 3)

Contemporaneously with his Complaint, Plaintiff moved for a preliminary injunction prohibiting Defendant Miami University from imposing disciplinary sanctions against him, in order to preserve *the status quo,* until this Court is able to determine the merits of his claims.  As noted above, the preliminary injunction hearing is scheduled for August 10, 2017.

---

[2] Plaintiff attached to his Complaint a PDF of the "Code of Student Conduct," which includes a section labeled "Sexual Misconduct (103A)."  The foregoing section defines sexual misconduct as "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent."  (Doc. 1; PAGEID# 70).

### c. Plaintiff's Motion for Temporary Restraining Order (Doc. 14)

On August 3, 2017, Plaintiff filed the instant Motion for Temporary Restraining Order. Plaintiff seeks an emergency order temporarily enjoining Defendants from releasing his name, or otherwise disclosing his identity, until the Court is able to rule on Plaintiff's motion for preliminary injunction.

Plaintiff represents that such a temporary order is necessary because, on August 1, 2017, Plaintiff received an email from Defendant Susan Vaughn indicating that Defendant Miami University had received a public records request for various records related to sexual misconduct investigations, including the investigation of the matter that is the subject of this litigation. Aug. 3, 2017 Affidavit of John Nokes ("Nokes Aff."), ¶2 and Exhibit A. According to Plaintiff, Defendant Vaughn further indicated that, while the identity of students involved in such investigations is typically redacted pursuant to the Family Educational Rights and Privacy Act (FERPA), Defendant Miami University intended to release Plaintiff's name (instead of redacting it) pursuant to a section of FERPA that excludes from its coverage the identity of a student who had been found "responsible" for a violation of the disciplinary code that could be considered "a crime of violence or a nonforcible sex offense." *Id*. Plaintiff claims, however, that he was found "responsible" based on a defective hearing that deprived him of Constitutional due process. (Doc. 1). Accordingly, on August 2, 2017, counsel for Plaintiff requested that Defendant Miami University agree to not disclose Plaintiff's identity pending this Court's ruling on the motion for preliminary injunction. (Doc. 14; PAGEID# 494). Defendant Miami University has not consented to such an agreement. (*Id*.)[3]

---

[3] Plaintiff characterizes Defendant Miami University as "refus[ing]" to consent (Doc. 14-1); however, at the August 3, 2017 Rule 65.1 Conference, Defendant Miami University explained

Plaintiff argues that this Court should enjoin the release of his name, reasoning that: (1) he is likely to succeed on the merits of his claims; (2) release of his name is likely to cause irreparable harm, including humiliation and loss of career opportunities; (3) Miami will not be harmed by an order enjoining the release of his name, because Plaintiff seeks only an interim order designed to preserve the status quo for "a few days"; and (4) an interim order serves the public interest in protecting the privacy rights of students from unnecessary disclosure. (Doc. 14).

## II. ANALYSIS

"A temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo." *Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 U.S. Dist. LEXIS 57689, at *8-9 (S. D. Ohio May 31, 2011) (quoting *Ohio Right to Life Soc'y Inc. v. Ohio Elections Comm'n*, No. 2:08-cv-492, 2010 U.S. Dist. LEXIS 103401, at *14 (S.D. Ohio Sept. 20, 2010)). In considering a temporary restraining order, the Court balances the following factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam). "These four considerations are factors to be balanced, not prerequisites that must be met." *Kessler*, 2011 U.S. Dist. LEXIS 57689, *10. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id*.

---

that it could not agree to consent even if it wanted to, given that its cooperation with public records requests is mandatory under the Ohio Public Records Act.

### a. Likelihood of Success

Plaintiff argues that he was found "responsible" for sexual misconduct after a defective hearing that violated his due process rights; Defendants argue that Plaintiff is unlikely to succeed on the merits of any of his claims. At the outset, the Court notes that a hearing on the preliminary injunction is scheduled for August 10, 2017, which will significantly color this Court's assessment of whether final judgment is likely to be entered in favor of Plaintiff. Therefore, at this early stage, in which the Court is ruling on a motion for emergency relief, the Court must focus its inquiry on the cases and facts as the Parties have presented them during expedited briefing. In other words, this Court's assessment of Plaintiff's likelihood of success on the merits is not based on an exhaustive analysis of the facts, law, or policy relevant or potentially relevant to the final resolution of this case. The Court may reach a contrary result after the preliminary injunction hearing.

### i. Lack of Notice

Plaintiff alleges that the Notice of Violation provided him inadequate notice of the subject matter of the hearing, in violation of his right to due process.

The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment prohibits States from depriving 'any person of life, liberty, or property, without due process of law.'" *Jaber v. Wayne State Univ. Bd. of Governors*, 487 F. App'x 995, 996 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1). To establish a procedural due process violation, a plaintiff must establish a constitutionally protected property or liberty interest and show that the state deprived the plaintiff of such interest without appropriate procedures. *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 155291, at *36 (S.D. Ohio Nov. 17, 2015).

Notice and opportunity to be heard remain the most basic requirements for procedural due process. *Id.* at *37.

In *Marshall*, a court in this district observed that "it is not entirely settled in the Sixth Circuit as to whether a student's continued enrollment at a state university is an interest protected by procedural due process." *Id*. (*comparing McGee v. Schoolcraft Cmty. College*, 167 Fed. Appx. 429, 437 (6th Cir. 2006), *with Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005)). However, the undersigned would note that *Flaim* (unlike *McGee*) was chosen for publication. In *Flaim*, the Sixth Circuit stated that "the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim*, 418 F.3d at 633 (citing *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986); *Goss v. Lopez*, 419 U.S. 565, 575, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988)).

In cases where the Sixth Circuit has found that the "school-disciplinary context" implicates due process, it requires that students receive the following: "(1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v. Cummins*, 662 Fed. Appx. 437, 446 (6th Cir. 2016).[4] "Notice satisfies due process if the student had sufficient notice of the charges against him and a *meaningful opportunity to prepare for the hearing*." *Flaim*, 418 F.3d at 638 (emphasis added). However, there is little by way of Sixth Circuit guidance detailing the exact form of

---

[4] *Doe v. Cummins* provides little other guidance, however, because there the plaintiffs essentially conceded that they received adequate notice. *Id*. at 447. Thus, there was no need for a detailed discussion of the form of notice.

7

notice to which students are entitled. In reliance on cases initiated against private institutions,[5] Plaintiff argues that students cannot be "expected to defend [themselves] against . . . vague and open-ended charge[s]." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D. Mass. Mar. 31, 2016). Furthermore, Plaintiff argues that giving students access to the university's investigative report does not relieve universities of the obligation to detail the precise conduct being called into question. *Doe v. Univ. of Notre Dame,* 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645, at *29 (N.D. Ind. May 8, 2017) (granting temporary restraining order and preliminary injunction).

In *Doe v. Notre Dame*, for example, the court found that plaintiff received inadequate notice of the precise disciplinary charges against him. There, the defendant university advised plaintiff pre-hearing that "the incident [at issue] may be a violation of the [u]niversity's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment." *Id*. at *28. The Northern District of Indiana found that the foregoing notice amounted to "no notice at all," and rejected the university's argument that notice was sufficient because it provided plaintiff "access to the Investigative Summary Report ten days prior to the hearing." Id. The court reasoned:

> "[The] sizeable volume of over 350 pages, its 18 page report from
> Investigator Kalamaros and 300+ pages of exhibits do not provide
> [plaintiff] with a statement of the particular conduct alleged to
> have been a violation of particular Notre Dame policies. And even
> if it did, ten days' notice might be found insufficient for this
> volume of material, particularly with [plaintiff's] graduation both
> at stake and on the immediate horizon."

*Id*. at *29.

---

[5] Cases against private institutions are often analogous, but the Court must note that such cases analyze notice under a breach-of-contract framework rather than under a Constitutional due process framework.

8

Defendants cite a case that reached the opposite conclusion, in which the District of Connecticut rejected plaintiff's notice arguments because – based on the incident report provided with the university's notice of violation – it was "imminently reasonable [for plaintiff] to infer . . . that the conduct for which [plaintiff] was being investigated was non-consensual sexual behavior." *Caiola v. Saddlemire*, 3:12-CV-00624 (VLB), 2013 U.S. Dist. LEXIS 43208, *19 (D. Conn. Mar. 27, 2013).[6]

Here, Defendants do not appear to dispute that Plaintiff was entitled to notice of the accusations against him, at least for purposes of opposing Plaintiff's motions seeking Rule 65 relief. Instead, they argue that – regardless of the content of the Notice of Hearing – Plaintiff cannot "rationally argue" that he was unaware that Jane Roe's ability to consent was at issue. Even if the Court takes the view that providing Plaintiff the investigative/incident report may be enough to put a student on notice, the Court believes that Defendants may possibly overstate

---

[6] Although *Doe v. Notre Dame* and *Caiola v. Saddlemire* appear to reach opposite conclusions, the Court is not convinced that either case is particularly helpful, as neither addresses whether violations implicating an "inability to consent" should be noticed differently than violations implicating a "lack of consent" in the context of university disciplinary hearings. While this Court recognizes that student disciplinary hearings require different due process than criminal prosecutions, this Court feels compelled to at least note that – in other areas of the law – violations implicating an "inability to consent" (for example, statutory rape) and "lack of consent" (for example, rape) are distinct legal concepts. If an accused is unsure of which charge he or she is defending, then the required "meaningful opportunity to prepare for the hearing" required by *Flaim* could possibly be compromised.

Defendants also cite two other cases of limited persuasive value, at least as they relate to the sufficiency of notice: (1) *Marshall,* 2015 U.S. Dist. LEXIS 155291, at *38; and (2) *Brown v. Univ. of Kansas,* 16 F. Supp. 3d 1275, 1289 (D. Kan. Apr. 18, 2014). *Marshall* is inapposite because, there, plaintiff did not allege that he received insufficient notice. 2015 U.S. Dist. LEXIS 155291, at *38. Furthermore, *Brown* is not persuasive because it derives its notice standards from a case that articulates the due process requirements where students "fac[e] temporary suspension" of "10 days or [fewer.]" 16 F. Supp. 3d at 1289 (citing *Goss v. Lopez*, 419 U.S. 565, 581, 95 S. Ct. 729, 740, 42 L. Ed. 2d 725, 739 (1975)).

9

their anticipated evidence that Plaintiff was on notice and thus able to adequately prepare for the hearing:

### a. Notice of Violation

Defendants argue that the Notice of Violation included a brief recitation of the facts and the specific provisions of the Code of Conduct Plaintiff was alleged to have violated. Defendants seem to ignore that the so-called "brief recitation of facts" omits the alcohol-related facts relating to the ultimate charge for which Plaintiff was found responsible (engaging in sexual conduct with an individual who was unable to knowingly consent); instead, it uses language suggesting force-related lack of consent (e.g., "resistance" and "holding her . . . down"). Additionally, Defendants do not address whether and to what extent the "brief recitation of facts" may have created the false impression that the *only* lack of consent theory being investigated by the university was force-related, since the university chose to use limiting language ("specifically") in the Notice of Violation:

> "The Office of Ethics and Student Conflict Resolution is in receipt of a report from [Jane Roe]. **Specifically**, on November 17, 2016, you allegedly penetrated [Jane Roe] with your fingers and performed unwanted oral sex on her in an alleyway by Bishop Hall. You allegedly continued even when she showed resistance. Furthermore, [Jane Roe] reported that she had to use the restroom, and as she entered the restroom in Bishop Hall, you allegedly entered with her, holding her head down to perform oral sex on you.
>
> This incident is an alleged violation of the Student Conduct Regulation- **Section(s) 103A (Sexual Assault)- 2 Counts.**"

(Doc. 17-1; PAGEID# 544) (first emphasis added; second emphasis in original). The university's choice of language should at least be considered when deciding whether Plaintiff was able to meaningfully prepare prior to the hearing, per *Flaim*.

### b. Hearing Packet/Jane Roe's Written Statement(s)

Defendants also argue that Plaintiff's access to the investigative report, and specifically Jane Roe's written statements, was sufficient to put him on notice of the consent theory being pursued. Plaintiff received Jane Roe's first written statement (Doc. 17-1; PAGEID# 546) on April 6, 2017, the same day he received the Notice of Violation. (Vaughn Decl. at ¶4). Plaintiff received Jane Roe's second written statement (Doc. 17-1: PAGEID# 600) on April 21, 2017, seven days before the hearing.

At the outset, the Court must note that it has not had the opportunity to perform an exhaustive analysis of the hearing packet. Even if it had, the Court is still mindful of the concerns expressed in *Doe v. Univ. of Notre Dame*, and the seeming lack of consensus among courts regarding the extent to which a student should be expected to infer from the hearing packet the specific nature of the accusations against him. This Court is not prepared to reconcile the approaches at this time.

Additionally, the Court is not yet willing at this early stage to determine what Plaintiff could or should have inferred from the hearing packet or written statements. However, the Court will at least note that the second written statement – received seven days before the hearing – from Jane Roe includes more information regarding the alleged effects of alcohol consumption on her than the first written statement; however, it also includes statements regarding alleged verbal and physical pressure from Plaintiff. (Doc. 17-1; PAGEID# 600) ("I felt pressured to perform oral sex"; "When I tried to pull back I felt pressure on the back of my head."). Again, however, the Court is not yet prepared to determine whether Plaintiff should have inferred that the university was pursuing a new, or additional, theory of consent based on the second written

11

statement. At this juncture, the Court views the hearing packet as having a neutral effect on the issue of notice, subject to later reconsideration.

### c. Opening Statement/ Nokes' Evidence

Defendants claim that Plaintiff's opening statement at the April 28, 2017 was "focused on" alcohol consumption and whether Jane Roe was able to consent. (Doc. 16; PAGEID# 513). This is where the Court believes that Defendants may most overstate their evidence. While it is true that Plaintiff discusses alcohol consumption, it is not clear whether he does so to defend against the university's consent theory, to provide a sequential account of the night, to enlighten the panel on the ability of eye witnesses' to recount the events of the night, or for some other reason. Regardless, the Court is not willing to accept Defendants' characterization that alcohol consumption was the "focus" of the opening statement, especially when Plaintiff also extensively discussed matters that can only relate to his alleged use of force (*e.g.*, the placement of his hands during oral sex). (Doc. 11-2; pp. 25-26).

Defendants also claim that Mr. Nokes himself offered evidence relating to alcohol consumption (testimony and text messages). For the reasons stated above, the Court is not prepared to infer that the mention of alcohol consumption necessarily means that Plaintiff was on notice of the university's consent theory.

### d. Statement of Facts on Appeal

Defendants also claim that Plaintiff's "Statement of Facts" on appeal demonstrates his pre-hearing notice of the university's consent theory. According to Defendants, his statements demonstrate Plaintiff's "notice that Ms. Roe's intoxication was a primary issue." (Doc. 16; PAGEID# 514). Defendants rely on Plaintiff's statement in which he paraphrases Jane Roe's allegations as claiming that "we engaged in nonconsensual contact, given that she was

12

intoxicated and thus unable to consent." (Doc. 16; PAGEID# 513) (citing Vaughn Decl.) Defendants omit the next sentence, in which Plaintiff states that Jane Roe "contended that I not only initiated unwanted oral sex upon her, but I also forced her to perform oral sex on me." (Doc. 17-3; PAGEID # 616).

Ultimately, the Court understands why Plaintiff's paraphrase of Jane Roe's allegations on appeal suggests to Defendants that he knew and understood the university's consent theory at the time he received the allegations. That said, Defendants cite nothing to suggest that Plaintiff should be bound by that *post-hearing* paraphrase, or that some form of judicial estoppel should apply. Accordingly, the Court finds Plaintiff's post-hearing paraphrase of limited value when the relevant inquiry under *Flaim* is whether the pre-hearing notice granted Plaintiff a meaningful opportunity to prepare.

In sum, there are significant factual and legal issues that will determine whether Plaintiff will succeed on his claim that he received inadequate notice in violation of his right to due process of law. Based on the foregoing, Plaintiff has demonstrated a sufficient likelihood of success at this juncture. *See Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) ("It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.").

13

### ii. Inability to Cross Examine

While Defendants do not appear to dispute that Plaintiff is entitled to notice of the accusations against him, Defendants disagree that Plaintiff was entitled to cross-examine witnesses.[7]

The Sixth Circuit's rulings underscore the unsettled nature of the law, at least with respect to the right to cross-examine where the accusations hinge on witness credibility. *Compare* C.*Y. v. Lakeview Pub. Schs*, 557 Fed. Appx. 426, 431 (6th Cir. 2014) (holding that student due process rights do "not entitle them to know the identity of student witnesses, or to cross-examine students or school administrators"), *with Flaim v. Med. College of Ohio*, 418 F.3d 629, 641 (6th Cir. Aug. 17, 2005) (discussing its prior *Jaska* holding that "the Constitution does not confer . . . the right to cross-examine," but also noting the Second Circuit's view that in cases involving "credibility, cross-examination of witnesses might [be] essential to a fair hearing"). Defendants correctly note that *Flaim* did not resolve this issue, because the hearing turned on whether the student had been convicted of a felony, making witness credibility irrelevant. *Id*. at 641.

The Court is unwilling to attempt to reconcile the above-referenced cases in this expedited proceeding. However, the success of Plaintiff's claim relating to his lack of cross-examination rises and falls with how this Court ultimately interprets *Flaim*. Under certain interpretations, he could prevail, especially in light of one panel member's statement that she must accept certain written accounts as true. *See* Section I.a, *supra*. Thus, at the temporary

---

[7] Plaintiff was allowed to cross-examine Jane Roe; however, Defendants concede that the hearing panel received witness statements of students who did not offer live testimony. (Doc. 16; PAGEID# 514). Defendants note that there exists no mechanism to compel the attendance of students at university disciplinary hearings. (*Id*. at 518)

14

restraining order phase, Plaintiff has demonstrated a sufficient likelihood of success. *See Northeast Ohio Coalition*, 696 F.3d at 591.

### b. Irreparable Harm

The Parties disagree on whether the harm caused by the release of Plaintiff's identity (e.g., humiliation, loss of career opportunities, etc.) constitutes irreparable harm, as a matter of law. Defendants argue that the release of Plaintiff's name will not cause irreparable harm, reasoning that courts in this district and elsewhere have found damage to reputation to be speculative or curable through compensatory damages. (Doc. 16; PAGEID# 520-521) (citing *Doe v. Ohio State Univ.*, No. 2:15-CV-2830, 2016 WL 692547, at *7 (S.D. Ohio Feb. 22, 2016); *Medlock v. Trs. of Ind. Univ.*, No. 1:11-CV-00977-TWP, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011); *Caiola,* 2013 WL 1310002, at *2; *Ashraf v.Boat*, No. 1:13-CV-533, 2013 WL 4017642, at *5 (S.D. Ohio Aug. 6, 2013) (recognizing that "courts have held that damages such as . . . embarrassment, humiliation, and damage to an individual's reputation fall short of irreparable harm," reasoning that "adequate compensatory or other corrective relief will be available at a later date")). Plaintiff cites cases that have reached the opposite result. (Doc. 19; PAGEID# 674) (*Stansbury v. Hopkins Hardwoods, Inc*., No. 4:15-CV-00016, 2016 U.S. Dist. LEXIS 82238, at *29 (W.D.Ky. June 23, 2016); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc*., 453 F.3d 377, 381-82 (6th Cir. 2006); *W.W. Williams Co. v. Google, Inc*., No. 2:13-cv-713, 2013 U.S. Dist. LEXIS 102343, at *28 (S.D. Ohio July 22, 2013) (finding that, even in the absence of presumed irreparable harm usually accorded in trademark cases, plaintiff was still able to establish irreparable harm to reputation because defendants' conduct allegedly tied it to "nefarious" conduct).

At the outset, the Court must note Plaintiff's argument that Defendants are likely to claim qualified immunity, possibly leaving injunctive relief as the only available remedy to cure harm flowing from the alleged constitutional violation(s). (Doc. 19; PAGEID# 675). Thus, Defendants' arguments that Plaintiff's harm is curable through compensatory damages may be misplaced. Regardless, based on the authority presented to this Court, the Court is disinclined to adopt a rule that harm to an individual's reputation does not constitute irreparable harm as a matter of law. Given the possibility that compensatory damages may be unavailable, Plaintiff has made a sufficient showing of irreparable harm at this juncture.[8]

### c. Injury to Third Parties and Public Interest

Each Party addresses the third and fourth factors (i.e., injury to third parties and public interest, respectively) together. Plaintiff generally argues that an injunction will not cause "harm to third parties or Miami." (Doc. 14; PAGEID# 496). Defendants disagree, arguing that an injunction barring the disclosure of Plaintiff's name would subject Defendant Miami University to a state mandamus action, which would harm the university and thus undermine the public's interest.

At the outset, the Court must note that Defendants criticize Plaintiff for citing "speculative" harm that will befall him if his name is released (i.e., humiliation, loss of career opportunities, etc.), but at the same time argue in conclusory fashion that withholding Plaintiff's

---

[8] In *United States v. Miami University*, the Sixth Circuit held that the "continued release of student disciplinary records will irreparably harm the United States and the DOE." *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002). The Parties disagree as to whether and to what extent this case applies here. Defendants suggest that the Sixth Circuit, in that case, balanced "the privacy interests of an alleged perpetrator with the public's right to know about such violations and determined that the alleged perpetrator's privacy interests are trumped by the public's right to know about such violations." (Doc. 18; PAGEID# 671, n. 1). However, the Sixth Circuit did not address the public's alleged right to know when the "alleged perpetrator" asserts a colorable civil rights claim that he or she was found responsible after a defective hearing.

16

name will necessarily result in a mandamus action. (Doc. 18; PAGEID #671). Indeed, Plaintiff correctly observes that "[n]othing in the record indicates that such a lawsuit has been threatened." (Doc. 19; PAGEID# 675). Plaintiff further argues that, even if the hypothetical lawsuit were to materialize, a short injunction barring the release of Plaintiff's name is "unlikely to create liability" because the Ohio Public Records Act requires only that records subject to disclosure be released within a "reasonable" period of time. (*Id*. at 676). On the latter point, Plaintiff reasons that "it is hard to imagine an Ohio Court finding that any delay caused by the Defendants' compliance with an Order of this Court was not 'reasonable.'" (*Id*.)

Regardless of how an Ohio Court would rule in a hypothetical lawsuit, this Court is not convinced that avoiding a state mandamus action should prevent this Court from fashioning emergency relief necessary to remedy a potential constitutional violation.

First, in enacting 42 U.S.C. § 1983, Congress empowered federal courts to issue orders to remedy the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States" caused by a state actor. Injunctions serve an important role:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights -- to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial." In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a "suit in equity" as one of the means of redress.

*Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 2162, 32 L. Ed. 2d 705, 717 (1972) (internal citations omitted). Furthermore, the Sixth Circuit has expressly recognized that, in order to vindicate an individual's constitutional rights, it may be necessary to craft injunctions "involving matters subject to state regulation." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998). In such circumstances, "injunctive relief involving matters subject to state

17

regulation may be no broader than necessary to remedy the constitutional violation." *Id*. Thus, the fact that access to public records is subject to state regulation, does not deprive this Court of its ability to issue an injunction necessary to remedy a constitutional violation. *Id*. (enjoining city's disclosure of personal information regarding law enforcement officers in response to public records request, unless the city first "provid[es] the officers meaningful notice").

Second, Defendant Vaughn's email correspondence with Plaintiff essentially admits that Plaintiff's identity would have been shielded under federal law but for the fact that he was found "responsible" after the university's disciplinary hearing (Doc. 14-1; PAGEID# 501); however, Plaintiff alleges that the panel reached its finding after a hearing that was fraught with Constitutional defects. Arguably, it was Defendants' alleged unconstitutional action that led to Plaintiff's name losing FERPA protection. The Court does not mean to suggest that, by depriving Plaintiff's name of FERPA protection, Defendants have deprived Plaintiff of a right enforceable in its own right under 42 U.S.C. § 1983. The law is clear that FERPA creates no such actionable "right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290, 122 S. Ct. 2268, 2279, 153 L. Ed. 2d 309, 326, 2002 U.S. LEXIS 4649, *33 (2002). However, as a Court sitting in equity, the Court is disinclined to ignore Defendants' potential role in causing this adverse consequence to Plaintiff.

Finally, even if a full mandamus action ensues, the Court is not convinced by Defendants' self-servingly defeatist arguments that an injunction from this Court equates to harm to the university and/or an automatic victory for mandamus petitioners. (Doc. 18; PAGEID# 671) (arguing that "[t]his Court's ordering the University to withhold information which it is required to produce will harm the University and the public" by "expos[ing] the University to a lawsuit"). The Ohio Public Records Act "excludes from the definition of public records those

records 'the release of which is prohibited by state or federal law.'" *United States v. Miami Univ.*, 294 F.3d 797, 803 (6th Cir. Ohio 2002) (quoting Ohio Rev. Code § 149.43(A)(1)(o)). Notwithstanding Defendants' argument that FERPA provides no basis on which to withhold Plaintiff's name, the United States Code criminalizes violations of federal injunctions. 18 U.S.C. § 401. Thus, even without FERPA protection, the issuance of a federal injunction barring the disclosure of Plaintiff's name – in order to remedy a potential constitutional violation– would provide Defendant Miami University grounds on which to assert that it has properly withheld Plaintiff's name based on Ohio Rev. Code § 149.43(A)(1)(o). Indeed, delay in responding to a public records request – necessitated by compliance with a federal injunction – is not without precedent. *Kallstrom*, 136 F.3d 1055, 1070 (6th Cir. 1998) (holding that "officers [were] entitled to injunctive relief prohibiting the City [of Columbus] from again disclosing this information without first providing the officers meaningful notice"). *Accord*: *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) (interpreting decision of the Ohio Supreme Court as requiring public universities to release student disciplinary records "in the absence of a federal court injunction"). Furthermore, the requested temporary restraining order will last "only a few days" (Doc. 14; p. 4), enhancing the argument that any delay caused by compliance with a short temporary restraining order is "reasonable" as that term is used in Ohio Rev. Code 149.43. If a longer injunction relating to the release of Plaintiff's identity is requested at the preliminary injunction hearing, then the Court will revisit this issue.

Accordingly, the Court finds the only argument offered by Defendants with respect to the third and fourth factors (*i.e.*, injury to third parties and public interest, respectively) unavailing. On balance, the temporary restraining order factors favor Plaintiff.

### III. CONCLUSION

For the foregoing reasons, the Motion (Doc. 14) is **GRANTED**. Pursuant to Fed. R. Civ. P. 65, it is **ORDERED** that:

a. Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme, and all those acting in active concert with them, are **ENJOINED** from releasing or otherwise publicly disclosing Plaintiff's name;

b. This Temporary Restraining Order shall expire on August 23, 2017 at 12:00 p.m., unless dissolved earlier or extended by the Court;

c. This Temporary Restraining Order is effective upon its entry; and

d. There is no requirement of a bond.

**IT IS SO ORDERED.**

                                                   s/ *Michael R. Barrett*
                                                   HON. MICHAEL R. BARRETT
                                                   UNITED STATES DISTRICT JUDGE