UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN NOKES,

        Plaintiff,

v.

MIAMI UNIVERSITY, et al.,

        Defendants.

_____/

Case No. 1:17-cv-482

Judge Michael R. Barrett

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOC. 2)**

This matter is before the Court on: (1) Plaintiff's July 16, 2017 Motion for Preliminary Injunction (Doc. 2), in which Plaintiff seeks an order "prohibiting [Defendant] Miami [University] from imposing . . . disciplinary sanctions against John [Nokes]"; and (2) Plaintiff's August 21, 2017 Motion to Strike Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 27). Consistent with Plaintiff's August 3, 2017 motion for a temporary restraining order (Doc. 14), Plaintiff also seeks an order preliminarily enjoining Defendants from releasing or otherwise publicly disclosing Plaintiff's name until this matter is resolved on the merits. Matters relating to the requested Rule 65 relief have been fully briefed, with each party also submitting post-hearing briefs (Doc. 23; Doc. 24) after the August 10, 2017 preliminary injunction hearing.[1]

## I.    BACKGROUND

Plaintiff – known as John Nokes for purposes of this lawsuit – is an undergraduate student at Defendant Miami University who has completed four semesters of coursework. Defendant Miami University has suspended John Nokes for approximately two years for

_____

[1] Defendants filed an additional memorandum (Doc. 26), triggering Plaintiff's pending Motion to Strike (Doc. 27), which is addressed in Section II.A *infra*.

allegedly engaging in sexual misconduct with another student, Jane Roe. Section 103A of Defendant Miami University's "Code of Student Conduct" defines sexual misconduct as "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent." (Doc. 1; PAGEID# 70). Under Section 103A of the Code, consent does not exist, *inter alia*, where sexual contact is initiated by force or while a participant is "severely intoxicated." (*Id.* at 70-71).

Plaintiff alleges that, after a procedurally defective disciplinary hearing, a hearing panel acting on behalf of Defendant Miami University found him responsible for sexual misconduct and informed Plaintiff that he was suspended from Defendant Miami University from April 6, 2017 through May 15, 2019. (Doc. 1; PAGEID# 28). On July 16, 2017, Plaintiff filed a Complaint for declaratory judgment, violation of 42 U.S.C. §1983, violation of Title IX, and injunctive relief against Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme. (Doc. 1). Specifically, Plaintiff claims that his due process rights were violated because: (1) he was afforded inadequate notice of the nature of the allegations against him; and (2) he was deprived of his alleged right to confront adverse witnesses through cross-examination. The Parties acknowledge that this Court is not a "super appeals" court reviewing the decision of the disciplinary panel; rather, the Court is determining issues relating to Constitutional due process in the context of university disciplinary proceedings. Accordingly, the background set forth below relates to both: (A) the process Plaintiff received from Defendant Miami University; and (B) the procedural posture of the instant lawsuit.

### A. Defendant Miami University's Disciplinary Proceeding against Plaintiff

It is undisputed that, in November 2016, Plaintiff and Jane Roe had sexual contact. Five months later, Jane Roe reported that she had been sexually assaulted by Plaintiff to Defendant Miami University's Office of Ethics and Student Conflict Resolution ("OESCR"). Thereafter, Defendant Miami University initiated a disciplinary proceeding against Plaintiff.

### 1. April 5, 2017 Notice of Violation

On April 5, 2017, the University provided Plaintiff with a Notice of Violation alleging that Plaintiff committed sexual assault by the use of force or threat of force, in violation of Section 103A (Sexual Assault). (*Id.* at 31) Specifically, the Notice of Violation stated as follows:

> "The [OESCR] is in receipt of a report from [Jane Roe]. Specifically, on November 17, 2016, you allegedly penetrated [Jane Roe] with your fingers and performed unwanted oral sex on her in an alleyway by Bishop Hall. You allegedly continued even when she showed resistance. Furthermore, [Jane Roe] reported that she had to use the restroom, and as she entered the restroom in Bishop Hall, you allegedly entered with her, holding her head down to perform oral sex on you.
>
> This incident is an alleged violation of the Student Conduct Regulation- **Section(s) 103A (Sexual Assault)- 2 Counts.**"

(Doc. 17-1; PAGEID# 544) (emphasis in original). The face of the Notice is silent on the issue of intoxication.

### 2. April 6, 2017 Summary Hearing

The next day, Defendant Miami University held a summary suspension hearing. (Doc. 11-1). The foregoing hearing did not address the merits of Jane Roe's accusation, and instead focused on whether Plaintiff would be permitted to remain on campus during the disciplinary

process. The Dean of Students presided, determined that Plaintiff presented no threat to the

student body, and allowed Plaintiff to remain. (Doc. 11-1).

### 3. Receipt of Jane Roe's Statements/Hearing Packet

Plaintiff received Jane Roe's first written statement (Doc. 17-1; PAGEID# 546) on April

6, 2017. (Vaughn Decl. at ¶4). The statement reads as follows:

> My name is [Jane Roe] and I am currently a sophomore at Miami
> University. I had a conference with [Miami employee] this
> afternoon and she suggested that I write this complaint as soon as
> possible because it is the end of the year.

> I would like to report another student on campus, [John Nokes], for
> a sexual assault that occurred on Thursday November 17th
> transitioning to the morning of Friday November 17th, 2016. This
> event took place just outside of Bishop residence hall and also,
> inside Bishop as well which is his current residence hall. While we
> were both under the influence and I wish I could count this as a
> "drunken mistake," but his intent for the act was made even more
> clearly apparent as the months went on.

> I have witnesses that can confirm that his intent was to have sex
> with me by the end of the night which he concluded could be done
> after at least buying me $28 in alcoholic beverages. He offered to
> walk me home and sent the other male away so he could walk me
> home himself. We were friends so I thought nothing of this at the
> time. We he [sic] asked if we could "hookup," I said no and made
> it clear that I was not interested in anything, but kissing. He puled
> [sic] me into the alleyway by Bishop, pulled up my dress and
> pulled down my panties. His form of making out consisted of him
> penetrating me with his fingers and him preforming [sic] unwanted
> oral sex on me. When I showed resistance he said, "come on it will
> be funny," and proceeded to continue against my hesitation. When
> I stumbled and almost fell on the sidewalk he decided that it was a
> good idea to try and have sex with me. I realized that I needed to
> use the restroom when he was already pulling to into his hall and
> taking me up to the second floor single restroom. I remember my
> confusion because I thought he was trying to enter the women's
> restroom. Then I remember my head being held down as I
> preformed [sic] oral sex on him. I tried to pull back and found
> resistance. After he was done it was about 1am on that Friday. He
> insisted on walking me home to [residence hall] because I was too
> drunk. It was at that point that he started saying things like, "Was

4

what we did wrong? Wow you're so drunk you need to walk straight. And the ultimate shocker, "You're not gonna sue me right?"

Let me know what other sort of information is needed and I can be contacted by email."

(Doc. 17-1; PAGEID# 546-547).

Plaintiff received Jane Roe's second written statement (Doc. 17-1: PAGEID# 600) on April 21, 2017, seven days before the hearing, along with the rest of the hearing packet. The second statement reads as follows:

"The night of November 17th, the group when [sic] to pitchers at 45 around 9:30pm. At that time [John Nokes] had bought me a pitcher of alcohol at the bar. I had most of the pitcher and was drinking from other pitchers. We went down to the hatch at about 10:00pm and continued drinking. [John] seemed to be drinking some as well. At about 11pn [sic] the group went to MIA after finishing the pitchers and [John] immediately offered to buy me a drink (Peach Bellini). In a relatively short period afterwards he bought me another one. [John] bought a Makers on the rocks and I drank some of that too. He made sure to get a seat next to me and even asked people to move so he could sit next to me. I drink part of my friend's [] beer. At that point I left the bar with [John Nokes] and [friend] at around 12:15. Walking towards Wells Hall, [John] sends [friend] away and I am left alone with him. [John] asks me if I want to hookup and suggests the single bathroom on his floor. I said, "No, I don't like to sleep around." I kissed him with the intention of not having sex. I was pulled into an alley to the side of Bishop visibly stumbling and slurring. He squatted down in the leaves attempting to preform [sic] oral sex on me even with my hesitation. He removed my underwear and said, "Come on it will be funny." He penetrated me with his fingers and his tongue while I struggled to stand. He kept commenting on how drunk I was. I said I needed to go to the restroom and he said, "Yeah that's where we are going," as he pulled me towards Bishop Hall. I remember asking to take the elevator because I was so exhausted. He walked in front of me to the bathroom and I remember my confusion when he opened the door. I thought he was trying to enter the women's restroom, but it was the single he previously talked about. I felt uncomfortable using  the restroom in front of him and I felt very nervous. He sat on the bathroom bench and motioned me over. We kissed and he undid his pants. I did not say yes or no, but felt

5

pressured to preform [sic] oral sex. When I tried to pull back I felt pressure on the back of my head. Once he was finished I yelled at him for I had not been able to breathe and was obviously shaken. I couldn't believe what had happened. I ran out of the bathroom and he chased after me catching the elevator door before it closed. He asked, "Was that okay? Was that bad what we did?" I was scared and ashamed so I said no. He kept pace with me making sure that I would get home because I was, "So drunk." I'm pretty sure I tried to sit down at one point and he kept me walking. Then he said, "You're not going to sue me right." At that point I was close to tears. He dropped me off at [residence hall] to which my roommate held me while I cried in our room. Minutes later he texted me at around 1am which are attached with this packet of documents."

(Doc. 17-1; PAGEID# 600). Although the term "severely intoxicated" is never used, each statement discusses alcohol consumption.

### 4. April 28, 2017 Disciplinary Hearing

At the April 28, 2017 hearing, Defendant Susan Vaughn presided. She began with remarks relating to the nature of the accusations against Plaintiff, and asked him to formally "respond" to the accusations as stated in the Notice of Violation. (Doc. 11-2; PAGEID# 188-189). Specifically, the allegedly non-consensual conduct occurring outside Bishop Hall was treated as one charge of sexual misconduct, and the allegedly non-consensual conduct occurring inside Bishop Hall was treated as a separate charge of sexual misconduct. (*Id*.). Plaintiff denied responsibility for both charges. (*Id*.).

Thereafter, Plaintiff was permitted to give an opening statement. In summary, Plaintiff stated that, on the night in question, he and several friends – including Jane Roe – made plans to meet at a bar in Oxford, Ohio. (*Id*.). They were going out, in part, to celebrate a friend's birthday. (*Id*.). According to Plaintiff, he planned to make it a relatively early night because he had a flight in the morning. (*Id*. at 193). At approximately 9:30 p.m., Plaintiff left his residence hall to walk to friends' dorms, and afterward the bar. (*Id*. at 189). Upon meeting with friends,

Jane Roe's friend (who later submitted a written statement on behalf of Jane Roe) allegedly "made a point to say, wow, doesn't [Jane] look great tonight." (*Id*. at 190). Plaintiff said he thought this was "odd" because he thought Jane Roe was dating Plaintiff's best friend (who later wrote a statement on behalf of Plaintiff, then attempted to recant it).[2] Plaintiff testified to drinking with friends at the bar, and buying Jane Roe a drink at her request. (*Id*. at 191). When group photographs were taken, Plaintiff said he was taken "off guard" when Jane Roe grabbed onto his shirt and "leaned over onto [his] shoulder." (*Id*. at 192).

Plaintiff testified that the group later changed locations to a second bar. (*Id*. at 193). Before going up to the bar to buy drinks, Plaintiff asked his friends if they wanted anything, and Jane Roe and others indicated that they did. (*Id*.). Plaintiff admitted to buying Jane Roe and others drinks that night. (*Id*.). Slightly after midnight, a friend in the group decided to leave and "all of us kind of realized that it was getting late[.]" (*Id*. at 194). Plaintiff allegedly announced that he was going to leave, and another friend stood up to leave with him; thereafter, "[Jane Roe] followed us outside the bar." (*Id*.). Plaintiff's friend split off at one of the intersections, but "[Jane Roe] followed along and continued walking in [Plaintiff's] direction." (*Id*. at 195). Plaintiff testified that Jane Roe grabbed onto his hand. (*Id*.) They allegedly continued to hold hands, and Plaintiff and Jane Roe allegedly started talking about "hooking up" that night. (*Id*.). According to Plaintiff, Jane Roe said that she did not "want to have sex," but "we can do other things." (*Id*.). Plaintiff testified that he said, "okay, that sounds fine with me," so they "walked into a pair of bushes that were standing directly facing King Library" where they began kissing for three or four minutes. (*Id*.). Plaintiff admitted to performing oral sex on Jane Roe, but only after allegedly telling her he "would like to perform oral sex on her," which he did for about five

---

[2] See n. 5, *infra*.

minutes with "no hesitation" from Jane Roe. (*Id*. at 196). Afterward, they continued to kiss and

Jane Roe allegedly "grabbed the general area of [Plaintiff's] pants and began rubbing that area

for about 30 seconds or so." (*Id*. at 197). He started to unzip his pants, but Jane Roe allegedly

said "what are you doing" and pointed to a "window a foot above us" at King Library. (*Id*.).

King Library was open and students were there studying. (*Id*.). Plaintiff allegedly told Jane Roe

that his roommate was sleeping in his dorm room, but made the suggestion that they go to a

private bathroom in his residence hall, to which she allegedly agreed. (*Id*.). Plaintiff testified

that Plaintiff and Jane Roe walked past King Library to his residence hall. (*Id*.). When they

entered the residence hall, they allegedly passed the women's restroom on the first floor in order

to take the elevator to the second floor. (*Id*.). Jane Roe allegedly continued to kiss Plaintiff in

the elevator. (*Id*. at 198).

According to Plaintiff, when they arrived in the second floor private bathroom, he sat on

the handicap seat inside the large shower. (*Id*. at 199). Jane Roe allegedly followed him into the

shower, set her things down, and "straddled" Plaintiff. (*Id*.).[3] They allegedly began kissing, she

allegedly rubbed "the general area of [his] pants and began doing the exact same thing as she did

outside." (*Id*. at 199). According to Plaintiff, Plaintiff unzipped his pants, and he and Jane Roe

discussed "whether [they] were going to have sex or not." (*Id*.). They allegedly agreed not to

have sex because "neither of [them] had a condom." (*Id*.). At that point, Jane Roe allegedly

"kind of put her hand on [Plaintiff's] shoulder so [he] could sit back down," and "under her own

power, 100 percent sat there on her knees and began to perform oral sex on [Plaintiff]." (*Id*.).

Plaintiff claims that for five minutes he had his hands behind his head, and he only ever "laid a

---

[3] Even though Jane Roe claimed that the conduct occurring outside the residence hall constituted sexual assault, Jane Roe admitted to later straddling Plaintiff when they arrived inside the private bathroom in the residence hall. (*Id*. at 353).

hand on her . . . [to] push her hair away from her face when we were having that conversation" about where she wanted him to "finish."  (*Id.*).

Afterward, Plaintiff walked Jane Roe home.  (*Id.* at 200).  The next day, Jane Roe – who admittedly was already "involved" with a mutual friend (*Id.* at 389) – sent Plaintiff a series of text messages expressing disgust at the behavior from the night before.  (Doc. 17-1; PAGEID# 608).  Plaintiff responded to the text messages, agreeing that their behavior was a "horrible decision." (*Id.* at 610).[4]

Several witnesses testified on behalf of Plaintiff.[5]  Plaintiff's witnesses, including Plaintiff himself, were questioned extensively by the panel regarding alcohol consumption on the night in question.  At one point, two members of the hearing panel – including Defendant Vaughn –suggested that *any* alcohol consumption eliminated Jane Roe's ability to consent:

> MR. SCOTT: Do you know what the training says about alcohol
> and consent?

---

[4] At the disciplinary hearing and later preliminary injunction hearing, Plaintiff was insistent that everything he and Jane Roe did was consensual, and that his responsive text messages to Jane Roe were not admissions that he had engaged in sexual misconduct.  Instead, he testified that his text messages acknowledging his "horrible decision" related to concerns about jeopardizing relationships with mutual friends.

[5] A witness who had previously provided a notarized witness statement to Plaintiff showed up at the hearing in order to urge the panel to *not* consider his notarized statement, because he supposedly did not understand that the statement may be used in a hearing and that he did want to be involved.  The panel did not entertain Plaintiff's offer to play the witness' recorded interview (Doc. 11-2; PAGEID# 286), in which the witness supposedly describes a conversation with Jane Roe in which she offers a different version of the night in question to the witness.  The panel does not follow any formal rules of evidence, so arguably the members could have used their discretion to listen to recording, but chose not to do so.  It is thus not entirely accurate for Defendants to claim (Doc. 16: PAGEID# 520) that Plaintiff attempted to prevent the panel from hearing the reluctant witness' account.  Furthermore, one of the issues in this case is the purported right of an *accused* student to confront *adverse* witnesses, so the Court is not persuaded by Defendants' argument that "Mr. Nokes should not be permitted to use provisions of the University's Code of Conduct [allowing use of written/recorded witness statement] where it benefits him, and then argue to this Court that his constitutional due process rights were violated by the same provision."

MR. [JOHN NOKES]: Which training?

MR. SCOTT: I think it's on this training that you've gone through.

MR. [JOHN NOKES]: It's on this training?

MR. SCOTT: What does it say about alcohol?

MR. [JOHN NOKES]: That an excess of alcohol is not -- an excess of alcohol does not -- you can't give consent if you have a large amount of alcohol.

MR. SCOTT: It's says large amount?

MR. [JOHN NOKES]: This is from my understanding, sure.

MR. SCOTT: It says alcohol. It does not say amount.

MR. [JOHN NOKES]: So with that definition -- I'm honestly just asking, but that definition if everybody on this campus who takes a drink of alcohol and kisses their boyfriend or girlfriend, is that nonconsensual?

MS. VAUGHN: Potentially, yes.

(Doc. 11-2; PAGEID# 318-319).

Later, Jane Roe testified. Plaintiff was permitted to direct questions of Jane Roe to the hearing panel, which in turn would ask the question to Jane Roe. No live witnesses testified on behalf of Jane Roe. Instead, she submitted three witness statements from friends who allegedly observed her behavior before or after her encounter with Plaintiff. For example, Jane Roe's roommate stated that Jane Roe came home that night "sobbing uncontrollably and slurring her words" and "unable to walk in a straight line." (Doc. 17-1; PAGEID# 604). Jane Roe allegedly told her roommate that John Nokes "took her to his dorm, took her into the bathroom, and even though she resisted, he held her head down and forced her to give him oral sex." (*Id.*). Plaintiff had no opportunity to confront this witness, as well as two other adverse witnesses, who did not

attend the hearing. During the course of the hearing, Defendant Vaughn stated: "when [Jane Roe] had three witness statements, it truly disadvantages everyone if you can't ask questions. So if we can't ask questions, I have to take this as fact. That all is true." (*Id*. at 271).

In his closing remarks, Plaintiff stated that he did not "attack" Jane Roe and that everything she did was of her own free will. (*Id*. at 376). After the hearing, the panel deliberated and found Plaintiff "responsible" for both charges on the basis that Jane Roe was "severely intoxicated" on the night in question and thus unable to consent. For the sanctioning portion of the hearing, Plaintiff offered character witnesses. He was later informed of his two-year suspension.

### 5. May 9, 2017 Appeal

On May 9, 2017, John Doe submitted an appeal. After two layers of review, the findings and sanction imposed were affirmed by University officials. (Doc. 17-6). On June 16, 2017, the disciplinary decision became final. This litigation followed.

### B. Procedural Posture of the Instant Lawsuit

### 1. Plaintiff's July 16, 2017 Complaint (Doc. 1)

On July 16, 2017, Plaintiff initiated this lawsuit. Plaintiff asserts that the disciplinary hearing was defective for two reasons.

First, Plaintiff argues that he was afforded inadequate notice of the nature of the allegations against him. Specifically, he argues that the Notice of Violation amounts to "no notice at all," because the April 28, 2017 hearing focused on Jane Roe's alcohol consumption and alleged inability to consent—not use of force as alleged in the Notice of Violation. (Doc. 2; PAGEID # 122, 129).

Second, Plaintiff argues that he was never provided the opportunity to cross-examine three adverse witnesses who supplied written testimony to the hearing panel, and that he was disadvantaged by the presiding panel member who stated that if "we can't ask questions, I have to take this as fact. That all is true." (Doc. 1; PAGEID# 24).

In addition to compensatory damages and declaratory relief, Plaintiff seeks a permanent injunction "restoring John [Nokes] as a student and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties." (*Id*. at 36).

### 2. Plaintiff's Motion for Preliminary Injunction (Doc. 3) and Motion for Temporary Restraining Order (Doc. 14)

Contemporaneously with his Complaint, Plaintiff moved for a preliminary injunction prohibiting Defendant Miami University from imposing disciplinary sanctions against him, in order to preserve the *status quo,* until this Court is able to determine the merits of his claims. Later, on August 3, 2017, Plaintiff filed an emergency motion seeking an order temporarily enjoining Defendants from releasing his name, or otherwise disclosing his identity, until the Court is able to rule on Plaintiff's motion for preliminary injunction. On August 9, 2017, the Court granted the temporary restraining order. (Doc. 9).

### 3. August 10, 2017 Preliminary Injunction Hearing

On August 10, 2017, Plaintiff testified, and the Court received into evidence the hearing transcripts from Defendant Miami University's disciplinary proceedings against Plaintiff. (Doc. 11). In lieu of closing remarks or oral argument on the pending motions, the parties elected to rest on the arguments in their papers. (Docs. 23; 24). The Court instructed the Parties that, if they wished to file post-hearing briefs, they were to confer among themselves and thereafter alert the Court to their decision by end-of-day. Although the Parties initially declined, Defendants contacted the Court on August 11, 2017 requesting leave to submit a short post-hearing brief by

end-of-day, stating that they had no objection to Plaintiff filing his post-hearing brief on August 14, 2017. Defendants' request and proposed briefing schedule was acceptable to the Court. Although the Court granted Plaintiff until August 15, 2017 to file a post-hearing brief, Plaintiff filed his post-hearing brief early, on Sunday, August 13, 2017.

### 4. Post-Hearing Briefing

Post-hearing briefing closed after Plaintiff submitted his August 13, 2017 memorandum. Thereafter, on August 20, 2017, Plaintiff filed a short Notice of Supplemental Authority (Doc. 25) alerting the Court to a relevant August 18, 2017 opinion from the United States District Court from the Middle District of Pennsylvania. The foregoing Notice contained a case citation and short parenthetical. In response, Defendants filed a five-page memorandum (Doc. 26) attempting to distinguish Plaintiff's supplemental authority, and further arguing points from the Rule 65 briefing that closed on August 13, 2017. Defendants' response triggered Plaintiff's pending Motion to Strike (Doc. 27), which is addressed immediately below.

## II. ANALYSIS

### A. Plaintiff's August 21, 2017 Motion to Strike Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 27)

Plaintiff argues that Defendants' five-page "response" (Doc. 26) should be stricken because "Defendants have used the filling [sic] of the Notice [of Supplemental Authority] as an opportunity to improperly submit an additional [memorandum]" in violation of S. D. Ohio Local Rule 7.2(a)(2). (Doc. 27). Specifically, Plaintiff argues that Defendants' "response" (Doc. 26) was an improper, transparent attempt to submit additional briefing without leave of Court:

> Not only does the [Defendants'] "Response" improperly contain argument attempting to distinguish the supplemental authority cited by Plaintiff, but the Defendants then proceed to spend three additional pages essentially replying to the authority cited by Plaintiff on the issue of "prejudice" in Plaintiff's Supplemental

> Memorandum. Defendants should not be permitted to take
> advantage of Plaintiff merely bringing an additional authority to
> the Court's attention to skirt the limitations on briefing established
> by Local Rule 7.2(a)(2).

(Doc 27; PAGEID# 733) (footnote omitted). However, Defendants argue that Plaintiff was the first to defy Local Rule 7.2, claiming that even though the Notice (Doc. 25) included no "developed" argument, "there is no reason why [Plaintiff] would submit such a notice unless he was trying to argue to the Court that the case he was 'supplementing' was supportive of his arguments." (Doc. 28; PAGEID# 735).

Local Rule 7.2(a)(2) provides that memoranda supporting and in opposition to motions shall be limited to an initial memorandum, an opposition, and a reply. The Rule prohibits further memoranda without leave of Court: "No additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown." However, the local rules are silent on what constitutes a memorandum, and whether courts should "strike" non-enumerated memoranda filed without leave. Furthermore, the Court's local rules provide no instruction on the manner in which parties should bring supplemental authority to the attention of the Court. In other words, the local rules do not resolve whether Plaintiff's Notice should be classified as a non-enumerated "memorandum," requiring leave under Local Rule 7.2.

The Court will not attempt to create a bright-line test for when a "notice" crosses the line into memorandum territory. Indeed, the Court needs no bright-line test in order to determine that Plaintiff's citation and short parenthetical did not open the door to Defendants' five-page memorandum, and especially did not open the door to three pages of additional briefing supporting the "prejudice" arguments contained in Defendants' post-hearing brief. Even if Defendants believed that Plaintiff should have requested leave to file his short notice, such a

belief does not absolve Defendants of their duty to seek leave before filing a five-page memorandum that includes arguments that relate back to a post-hearing brief. In such a motion seeking leave, Defendants could have raised with the Court their argument that Plaintiff's Notice violated Local Rule 7.2.[6]

Ultimately, the Court is firmly convinced that Defendants' memorandum violated Local Rule 7.2; however, the Court is less convinced that the proper course of action is to "strike" the document. Again, the local rules are silent on whether courts should "strike" non-enumerated memoranda filed without leave. Furthermore, the Federal Rules of Civil Procedure provide no mechanism for "striking" documents other than pleadings. Fed. R. Civ. P. 12(f). Even though parties (and sometimes even courts) frequently refer to all court filings as "pleadings," such usage is imprecise and incorrect.[7] The only documents that qualify as "pleadings" are enumerated in Fed. R. Civ. P. 7(a) (e.g., complaint, answer, crossclaim, etc.); memoranda are not listed. Thus, orders "striking" non-pleadings such as memoranda are not a proper usage of Rule 12(f). *Johnson v. Wolgemuth*, 257 F. Supp. 2d 1013, 1024 (S.D. Ohio Mar. 10, 2003) (Rice, J.) (declining to "strike" expert report at summary judgment phase; reasoning that Rule 12(f) only allows matters contained within the "pleadings" to be stricken, so "the remedy is not to strike

---

[6] Again, the Court is disinclined to create a bright-line test for when a notice of supplemental authority constitutes an additional memorandum requiring leave under Rule 7.2. The Court will note, however, that it is not persuaded by Defendants' arguments that Plaintiff's notice is a form of "argument" because it cites a case in which a district court granted a preliminary injunction. While the Notice mentions the district court's disposition, it otherwise neutrally describes the case as "supplemental authority to aid the Court in its consideration of the Motion for Preliminary Injunction." (Doc. 25). Thereafter, it provides a citation and short parenthetical for a case that had been decided the previous business day. In this instance, the Court does not believe that Plaintiff crossed the line into argument, or that it is a good idea to punish parties for bringing new authority to the attention of the Court, especially where the local rules are silent on the procedure for doing so.

[7] For example, Defendants misuse the term "pleadings." (Doc. 28; PAGEID# 735) ("Mr. Nokes admits that his Notice was outside of those pleadings[.]" )

[the] affidavit; it is simply to ignore it"); *Maxum Indem. Co. v. Drive W. Ins. Servces*, No. 1:13-cv-191, 2014 U.S. Dist. LEXIS 196740, at *6 (S.D. Ohio June 13, 2014) (Bowman, M.J.) (denying motion to strike; agreeing with other courts in Sixth Circuit holding that "motions to strike are inapplicable" where a non-pleading is the subject of the motion to strike); *Dawson v. City of Kent,* 682 F.Supp. 920, 922 (N.D. Ohio 1988)("The federal rules make only one reference to a motion to strike in Rule 12(f). This rule relates only to pleadings and is inapplicable to other filings."); *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 864 (M.D. Tenn. Dec. 13, 2005) (declining to rule on motion to strike, because "[m]otions to strike relate only to 'pleadings,' a term which is narrowly defined by Rule 7(a) of the Federal Rules of Procedure").

Accordingly, the Court **DENIES** the Motion to Strike (Doc. 27). However, the Court will caution Defendants that: (1) further violations of Local Rule 7.2 will not be tolerated; (2) any such violation will be deemed a violation of an Order of this Court; and (3) even if "striking" non-compliant documents is not the proper remedy under Rule 12(f) or the local rules, the Court will fashion an appropriate remedy for future violations consistent with its inherent power to enforce compliance with its lawful orders. *Bds. of Trs. of Ohio Laborers' Fringe Benefit Programs v. Dixon Masonry, Inc.*, No. 2:09-cv-01013, 2010 U.S. Dist. LEXIS 140501, at *3 (S.D. Ohio Dec. 2, 2010) (citing *S.E.C. v. Dollar Gen. Corp*., 378 Fed. Appx. 511, 516 (6th Cir. 2010); *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966)). This admonition may seem harsh for Defendants' first violation, but the Court deems it appropriate given how strongly the Court expressed its dislike for surprise at the preliminary injunction hearing. The Court was also clear that it wanted the parties to work together to determine the need for, and timing of, a fair process for post-hearing briefing. Plaintiff's Notice

(Doc. 25) containing a single case citation from the previous business day – with no argument – did not open the door for Defendants to file a five-page memorandum without leave.

**B. Plaintiff's July 16, 2017 Motion for Preliminary Injunction (Doc. 2)**

The purpose of a preliminary injunction is to preserve the *status quo*. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam). "These four considerations are factors to be balanced, not prerequisites that must be met." *Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 U.S. Dist. LEXIS 57689, at *8-9 (S. D. Ohio May 31, 2011). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id*.

**i. Likelihood of Success**

With regard to this first element, the Court will begin by restating its earlier reservations about "resolving" hotly contested issues of law in any expedited Rule 65 proceeding. (Doc. 21; PAGEID# 692) ("[T]his Court's assessment of Plaintiff's likelihood of success on the merits is not based on an exhaustive analysis of the facts, law, or policy relevant or potentially relevant to the final resolution of this case."). Courts across this Circuit and the country for that matter are being asked to answer the difficult question of how much process was due any particular student, and whether that student's university at least met the minimum threshold required. At the same time, federal circuit courts have generally avoided issuing broad rulings, tacitly recognizing that

each university follows different disciplinary procedures and each student's path through the university disciplinary process is likewise different. *See*, *e.g.*, *Flaim v. Med. College of Ohio*, 418 F.3d 629, 636 (6th Cir. Ohio Aug. 17, 2005) ("*some* circumstances may require the opportunity to cross-examine witnesses"; "*some* circumstances . . . might [warrant disclosure of] the names of witnesses and a list of other evidence the school intends to present," etc.) (emphases added). *Accord*: *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 657 (S.D. Ohio Nov. 7, 2016) ("The Court uses the term 'generally' because due process is a flexible concept and may require more or less process depending on the situation."). Therefore, given the complexity of the law, and that this matter is still before the Court in an expedited Rule 65 proceeding, the Court continues to assess Plaintiff's likelihood of success based on whether Plaintiff has "raised [factual or legal] questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." (Doc. 21; PAGEID# 699) (citing *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). *Accord*: *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 Fed. Appx. 969, 972, 2007 U.S. App. LEXIS 21589, *7-8 (6th Cir. Aug. 29, 2007) (citing *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1989)); *Ohio Republican Party v. Brunner*, 544 F.3d 711, 720-721, 2008 U.S. App. LEXIS 21573, *26 (6th Cir. Oct. 14, 2008) (*en banc*).

Ultimately, nothing about the preliminary injunction hearing or post-hearing briefing has changed this Court's initial conclusion that Plaintiff has raised sufficiently difficult and serious questions. The Court thus incorporates by reference its likelihood of success analysis included in the earlier temporary restraining order (Doc. 21), and makes the following, additional observations about issues that arose during the preliminary injunction hearing and in the post-hearing briefs:

### a. Prejudice

The Court is not persuaded by Defendants' new argument that Plaintiff is required to establish that – absent the alleged Constitutional violations – Defendant Miami University's hearing panel would have reached a different outcome. (Doc. 23; PAGEID# 708).

Plaintiff chiefly relies on a single Eastern District of Michigan case, which granted the defendants' motion for summary judgment because plaintiff could not show that plaintiff's "suspension occurred because of a failure of procedural due process" – thus, he was not "prejudiced by a lack of process." *Jahn v. Farnsworth*, 33 F. Supp. 3d 866, 874 (E.D. Mich. July 16, 2014) (citing *Graham v. Mukasey,* 519 F.3d 546, 549 (6th Cir. 2008)). In *Jahn*, however, the plaintiff had admitted "guilt" in advance of the hearing. *Id.* In theory, his suspension would have been proper with or without a hearing, weakening his claim that he was entitled to or "deprived of" a hearing. Here, there was no such admission of responsibility. *See* n. 2, *supra*.

Furthermore, *Graham* (which was cited in *Jahn*) is likewise inapposite. Plaintiff argues that – in holding that a plaintiff must show that the relevant tribunal would have reached a different outcome absent the due process violation – *Graham* relied on an "earlier Sixth Circuit decision dealing with immigration law" and that limited its holding to immigration hearings only. (Doc. 24; PAGEID# 719) (observing that *Graham* relied on *Warner v. Ashcroft*, 381 F.3d 534 (6th Cir. 2004), which held that "proof of prejudice is necessary to establish a due process violation *in an immigration hearing*") (emphasis added)). While the Court declines to resolve whether the Sixth Circuit intended to so limit its holding, the Court feels compelled to note that Defendants' "response" (Doc. 26) – which was the subject of Plaintiff's Motion to Strike (Doc. 27) – does not challenge Plaintiff's interpretation of *Graham* or *Warner*. Furthermore, Defendants' response cites additional authority from the Fourth Circuit, Fifth Circuit, Tenth

Circuit , and the District of Kansas (Doc. 26; PAGEID# 728)—however, no additional authority from the Sixth Circuit regarding the so-called prejudice requirement is cited.

Accordingly, this Court is not persuaded – based on the authority before the Court – that Sixth Circuit plaintiffs are required to show that the "outcome" of the hearing would have been different absent the alleged Constitutional violations.  Just as this Court is unwilling to "second guess" the disciplinary panel's outcome, the Court is also unwilling to accept Defendants' invitation to use *Jahn* or *Graham* as a basis to speculate regarding the panel's outcome had the alleged Constitutional violations not occurred—especially where the disciplinary hearing turned on the credibility of the witnesses, many of which were absent for cross-examination (the lack of which is the alleged Constitutional violation of which Plaintiff complains).  The Court cannot and will not guess at: (1) how those absent witnesses would have fared during questioning; and (2) how the panel would have weighed the absent witnesses' testimony.[8]

### b.  Notice

In cases where the Sixth Circuit has found that the "school-disciplinary context" implicates due process, it requires that students receive the following:  "(1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker."  *Doe v. Cummins*, 662 Fed. Appx. 437, 446 (6th Cir. 2016).  *Accord:  Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 709 (S.D. Ohio Nov. 30, 2016).  "Notice satisfies due process if the student had sufficient notice of the charges against him and a *meaningful opportunity to prepare for the hearing*."  *Flaim*, 418 F.3d at 638 (emphasis added).

---

[8] As shown below, the Court would still find a sufficient likelihood of success if it were to impose a required prejudice showing on Plaintiff.

It is not lost on the Court that, regardless of the language in the Notice of Violation, Jane Roe's pre-hearing written statements both discuss alcohol consumption. However, the Court is not – at this stage – prepared to find that Plaintiff is unlikely to prevail. On the issue of notice, the preliminary injunction hearing and the post-hearing briefing raised difficult and serious questions:

First, at the preliminary injunction hearing, Defendants questioned Plaintiff on Section 103A of the "Code of Student Conduct," which defines sexual misconduct as "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent." (Doc. 1; PAGEID# 70). Defendants asked Plaintiff to admit that the foregoing section contemplates at least two different "situations" where a party cannot give consent. Plaintiff agreed that the Code contemplates a lack of consent where: (1) the person is "coerced or forced"; and (2) the person is "severely intoxicated." Defendants seem to believe that the Code's broad consent definition is a helpful fact for them (*see also* Doc. 23; PAGEID# 710, n. 2), seemingly based on the theory that Section 103A should have placed Plaintiff on notice that all forms of consent would be at issue, thus giving him an adequate opportunity to prepare for his defense against the accusation(s) that he forced Jane Roe, and/or coerced Jane Roe, and/or took advantage of Jane Roe while she was severely intoxicated, or some combination of the foregoing. Similar arguments have been rejected by other courts at the Rule 65 stage. *See, e.g.*, *Doe v. Univ. of Notre Dame,* 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645, at *29 (N.D. Ind. May 8, 2017) (granting temporary restraining order and preliminary injunction, where the accused student was provided a "list of the four Standards of Conduct" he may have violated, and "access to the Investigative Summary Report ten days prior to the hearing").

Second, regardless of whether directing a student to broad code section or the investigative report fulfills the notice requirement, Defendants have not adequately addressed this Court's initial concern (Doc. 21; PAGEID# 696) that the April 5, 2017 Notice of Violation used limiting language ("specifically") to narrow the Section 103A violations being investigated and pursued by the university.  As the Court previously noted, the Notice of Violation "specifically" focuses on Plaintiff's alleged use of force, and fails to mention Jane Roe's alleged severe intoxication—or any alcohol consumption, for that matter.   In other words, once a university directs a student to a broad certain code section, but limits the "specific" conduct that is being investigated, can it credibly argue the student should still be on notice that it must defend all possible violations of that section?

The closest Defendants come to addressing this issue is its suggestion that, once a plaintiff receives "proper notice regarding the charge of assault and [is] expelled for the assault, [a plaintiff] would not be prejudiced by the [panel] justifying expulsion on additional grounds." (Doc. 23; PAGEID# 710) (citing *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001)).  However, *Watson* is inapposite because plaintiff was found responsible for the noticed violation (assault), which alone was grounds for expulsion; the fact that additional violations were addressed at the hearing made little difference.  Here, Plaintiff was *not* found responsible for the noticed violation, *i.e.*, sexual misconduct by use of force.  Even if the Court were to accept the legal principle embodied in *Watson*, the case is factually distinct.

Third, the Court is troubled by Defendants' attempt to diminish the importance of the specific language in the Notice of Violation, especially when the April 28, 2017 hearing transcript reflects that Plaintiff was required to essentially plead to each "charge" in the Notice of Violation at the beginning of the hearing.  (Doc. 11-2; PAGEID# 188-189).

Fourth, the Court is not yet prepared to accept Defendants' argument that Jane Roe's "second statement" – which more extensively discusses alcohol consumption – should have placed Plaintiff on notice of the university's consent theory. Even if the Court accepts the "second statement" as the notice, "due process is not satisfied unless the noticed party has a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638 (emphasis added). Defendants do not address Plaintiff's argument that, even if the "second statement" qualifies as sufficient notice of the type of allegation, the notice was still legally inadequate because: "(1) the new theory of intoxication was provided to Nokes only one week before the hearing, which was not sufficient time to prepare a defense; and (2) John Nokes received 'notice' of this new theory of intoxication only after he had been required to submit a statement, other witness statements, and evidence of his own for inclusion in the hearing packet in response to the initial version of events." (Doc. 20; PAGEID# 680) (citing *Notre Dame*, 2017 U.S. Dist. LEXIS 69645, at *29). The Court is not holding as a matter of law that seven days constitutes inadequate time to prepare; rather, the Court is expressing that it not sufficiently satisfied – based on the current record – that Plaintiff had a meaningful opportunity to prepare; thus, a finding that he is unlikely to succeed would be inappropriate at this juncture.

Fifth, Defendants point to the fact that Plaintiff used the term "severely intoxicated" in his opening remarks as conclusive proof that he was on notice of the university's consent theory in advance of the hearing, and thus had a meaningful opportunity to prepare pre-hearing to defend against that particular theory of consent. (Doc. 23; PAGEID# 709) (citing Doc. 11-2; PAGEID# 193). Defendants ignore that Defendant Vaughn was the first person to discuss "severe intoxication" at the hearing. She stated – <u>before</u> Plaintiff's opening statement – that, "[b]y law a person cannot legally give consent no matter what they might say when the person is

severely intoxicated due to alcohol or drugs; incapacitated or unconscious." (Doc. 11-2; PAGEID# 186). Plaintiff testified at the preliminary injunction hearing that he tried "his best" to adapt at the disciplinary hearing. Ultimately, the fact that Plaintiff used the term "severe intoxication" in his opening remarks, and otherwise discussed alcohol consumption, could mean that he was on notice of this consent theory prior to the hearing; or, it could mean that he was trying to adapt to a potential moving target Defendant Vaughn presented to him at the disciplinary hearing based on her early mention of "severe intoxication."[9]

Finally, even if the Court accepts Defendants' argument that notice is irrelevant unless Plaintiff can show he was prejudiced by the lack of notice, Plaintiff has pointed to additional evidence he would have used at the hearing had he been given adequate notice. Defendants attack the "new" evidence as having already been rejected on Plaintiff's internal appeal; however, Plaintiff persuasively argues that the fact that the fact that a University official "did not accept [Plaintiff's new] evidence on appeal should hardly be conclusive of the issue." Thus, the Court is unable to conclude – at this stage – that "[a]dditional notice would not have allowed [Plaintiff] to better defend the allegations." *Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (finding a lack of prejudice because "Mr. Watson candidly admitted his guilt, [so] Mr. Watson was not prejudiced by a lack of notice").

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has shown a sufficient likelihood of success and "raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a

---

[9] Plaintiff claims that no Miami official ever alerted him pre-hearing that "severe intoxication" was at issue. Defendant Vaughn was present at the preliminary injunction hearing, but did not take the stand to contradict Plaintiff's assertion or otherwise provide a contrary account of Plaintiff's pre-hearing notice.

fair ground for litigation and thus for more deliberate investigation." *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).

### c. Cross-Examination

In the university disciplinary context, the Sixth Circuit has observed that "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases." *Flaim*, 418 F.3d at 636.  In *Flaim*, the Sixth Circuit made reference to Second Circuit language stating that – in university disciplinary proceedings hinging on "a choice between believing an accuser and an accused" – "cross-examination is not only beneficial, but essential to due process." *Flaim*, 418 F.3d at 641. *Accord*: *Doe v. Ohio State Univ.*, 219 F. Supp. 3d at 660 (analyzing *Flaim*, but recognizing that the foregoing language was *dictum*); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d at 710 (same).  Furthermore, in *Doe v. Univ. of Cincinnati*, the undersigned recognized the general principle that the need for cross-examination in the university setting is greater than in other educational settings:  "[i]n a university setting, the administrators do not have the same 'particularized knowledge' of a student's trustworthiness that exists in a high school with a smaller student population."  223 F. Supp. 3d at 711 (noting "total enrollment of UC during the 2016-2017 academic year is 44,338 undergraduate and graduate students").

Although not as large as the University of Cincinnati, Defendant Miami University cannot dispute that it is a large public university, with total enrollment (including regional campuses) exceeding 24,000.  *See* http://miamioh.edu/about-miami/quick-facts/ (last visited August 24, 2017).  Likewise, it cannot dispute that it allowed Jane Roe to offer the testimony of three witnesses via written statement only.  (Doc. 17-1).  For example, she offered the written statement of her roommate, who stated that Jane Roe was in tears after her encounter with

Plaintiff.  (Doc. 17-1; PAGEID# 604).  John Nokes was never able to test the roommate's memory or credibility, including any improper motives for testifying as such.  What's more, the hearing transcript clearly reflects that Defendant Vaughn stated:  "when [Jane Roe] had three witness statements, it truly disadvantages everyone if you can't ask questions.  So if we can't ask questions, I have to take this as fact.  That all is true."  (Doc. 11-2; PAGEID# 271).  Based on these facts, the Court stands by its earlier conclusion that, "[u]nder certain interpretations [of *Flaim*], [Plaintiff may] prevail, especially in light of one panel member's statement that she must accept certain written accounts as true."  (Doc. 21).[10]

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has shown a sufficient likelihood of success and "raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).

## ii.  Irreparable Harm

In university discipline cases, this Court has previously found sufficient irreparable harm to warrant a preliminary injunction where suspension and damage to reputation are at issue.  *Doe*

---

[10] In post-hearing briefing, Defendants argue that Plaintiff failed to establish at the preliminary injunction hearing how cross-examination of Jane Roe's three witnesses would have changed the "outcome."  (Doc. 23; PAGEID# 711).  As indicated above, this Court is not convinced by Defendants' cited authority that evidence of a "changed outcome" is required to prevail.  Regardless, Defendants' argument that cross-examination could not have changed the outcome is unavailing.  Specifically, in response to Plaintiff's argument that he would have challenged witness credibility had he been given the opportunity to cross-examine (i.e., lack of personal knowledge, memory, etc.), Defendants argue that Plaintiff "was able to do all of these things himself through his statements to the Hearing Panel."  (Doc. 23; PAGEID 711).  Defendants miss the point of cross examination, which allows the fact-finder to assess *witness demeanor and responses* in order to "assess the credibility of those who disclaim any improper motivations."  *Hart v. Lew*, 973 F.Supp.2d 561, 574 (D. Md. 2013).  If anything, Defendants' claim that no amount of cross-examination could have changed the minds of the hearing panel members arguably undercuts the fairness of the hearing Plaintiff received.

*v. Univ. of Cincinnati*, 223 F. Supp. 3d at 712. The Court acknowledges, however, a split in authority. (Doc. 21; PAGEID# 701). That is, some courts deem such harm compensable through monetary damages; others do not. As this Court stated in its temporary restraining order, however, the undersigned is disinclined to embrace a rule that suspension and harm to an individual's reputation cannot constitute irreparable harm as a matter of law. Furthermore, any argument that Plaintiff only claims speculative harm would be misplaced. At the preliminary injunction hearing, Plaintiff testified to the cyclical nature of job opportunities in his field, and other complications that will prevent him from applying for competitive internships necessary to advance due to his lack of enrollment. Plaintiff has thus made a sufficient showing of irreparable harm. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d at 712; *Ritter v. Oklahoma*, 2016 U.S. Dist. LEXIS 60193, at *8 (W.D. Okla. May 6, 2016) ("The court concludes plaintiff has also demonstrated that he will suffer irreparable harm if the injunction is denied. The loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages."). *Accord*: *Doe v. Univ. of Notre Dame*, 2017 U.S. Dist. LEXIS 69645, *38 (N.D. Ind. May 8, 2017); *Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 U.S. Dist. LEXIS 124540 (D.Vt. Sept. 16, 2015); *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, at *13 (S.D.Ind. Aug. 22, 2014).[11]

---

[11] The Court feels compelled to at least note that Ohio's public universities often benefit from a presumption of irreparable harm in their business injunction cases. For example, in trademark cases, universities have benefitted from the rule that, due to a "trademark's unique role in protecting intangible assets, such as *reputation and goodwill,*" injuries "that arise as a result of trademark infringement and public confusion are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, at 755-756 (S.D. Ohio Aug. 27, 2010) (emphasis added; internal citations omitted). Yet, when faced with a split in authority, Defendant Miami University would have this Court take the view that a damages such as "embarrassment, humiliation, and damage to an

Based on the foregoing, and for the reasons stated in the Court's temporary restraining order (Doc. 21), Plaintiff has made a sufficient showing of irreparable harm.

### iii.  Injury to Third Parties and Public Interest

Each Party addresses the third and fourth preliminary injunction factors (i.e., injury to third parties and public interest, respectively) together.

Initially, the Court will note that Defendants' post-hearing briefing is silent on any harm the public or third-parties will suffer if the temporary restraining order enjoining the release of Plaintiff's name is extended.  Specifically, this Court temporarily enjoined Defendants from releasing Plaintiff's name in response to public records requests made under Ohio's Public Records Act.  In the temporary restraining order, the Court was clear that it would revisit this issue if a longer injunction was sought; however, in the post-hearing briefing, Defendants have not brought to this Court's attention new developments suggesting that third parties or the public will suffer injury as a result of a longer injunction enjoining the release of Plaintiff's name.

Plaintiff's request to enjoin the imposition of discipline requires a somewhat different analysis.  While universities have an interest in maintaining their disciplinary system and protecting victims, the public interest is likewise served "by the robust enforcement of constitutional rights."  *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012).  Here, Plaintiff was permitted to remain on campus during the disciplinary process, as Miami found after a summary suspension hearing that Plaintiff did not

---

*individual's* reputation fall short of irreparable harm."  (Doc. 16; PAGEID# 521) (emphasis added).  In other words, damage to an entity's reputation based on a single act of trademark infringement may be irreparable; damage to a person's reputation – connecting that individual to something as universally reviled as sexual assault – is not irreparable.  The Court is simply not persuaded.

pose a direct threat to Jane Roe or the student body.  Defendants have not brought to this Court's attention facts suggesting otherwise.

Therefore, on balance, all four preliminary injunction factors favor Plaintiff.

## III.  CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES** Plaintiff's Motion to Strike (Doc. 27), but reminds Defendants of the Court's above admonitions; and

(2) **GRANTS** Plaintiff's Motion for Preliminary Injunction (Doc. 2).  Therefore, pursuant to Fed. R. Civ. P. 65, it is **ORDERED** that:

    a.  Defendant Miami University, and all those acting in active concert with it, is preliminarily **ENJOINED** from imposing disciplinary sanctions against John Nokes, subject to the requirement that John Nokes have no contact with Jane Roe;

    b.  Defendants Miami University, Susan Vaughn, Steven Elliott, Jayne Brownell, and Michael Curme, and all those acting in active concert with them, are preliminarily **ENJOINED** from releasing or otherwise publicly disclosing Plaintiff's name;

    c.  This Order is effective upon its entry; and

    d.  There is no requirement of a bond.

**IT IS SO ORDERED.**

                               *s/ Michael R. Barrett*
                              HON. MICHAEL R. BARRETT
                              UNITED STATES DISTRICT JUDGE